IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| IN RE HATTERAS FINANCIAL, INC. SHAREHOLDER LITIGATION | ) Lead Case No. 1:16cv445<br>)<br>) MASTER FILE |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | )<br>)<br>)<br>) |

**MEMORANDUM OPINION, ORDER, AND FINAL JUDGMENT**

THOMAS D. SCHROEDER, District Judge.

These consolidated cases (the "Consolidated Actions") came before the court for a hearing (the "Settlement Hearing") on November 8, 2017, pursuant to this court's Order of Preliminary Approval of Settlement, Form and Manner of Notice, and Scheduling of Settlement Hearing dated July 3, 2017 (the "Preliminary Approval Order") (Doc. 40), and upon a Stipulation and Agreement of Settlement dated May 4, 2017 (the "Stipulation") (Doc. 46-1), which is incorporated herein by reference.[1] The parties were represented by their attorneys of record, following due notice of the Settlement Hearing given in accordance with the Preliminary Approval Order.

The court has heard and considered evidence in support of the

---
[1] Except as otherwise expressly defined herein, all capitalized terms shall have the same definitions as set forth in the Stipulation. (Doc. 46-1.)

motion for final approval of the proposed settlement (the "Settlement") (Doc. 44) set forth in the Stipulation. All persons requesting to be heard in accordance with the Preliminary Approval Order were given the opportunity to do so. No shareholder filed an objection with Hatteras Financial, Inc. ("Hatteras"), according to the procedures set forth in this court's Preliminary Approval Order. However, one shareholder mailed a letter directly to the court, describing the additional disclosures obtained by Plaintiffs as "trivial information" and objecting to the requested $700,000 in attorneys' fees as a "totally extravagant amount." The court shared the letter with all counsel. At the November 8 hearing, co-lead Plaintiffs' counsel ("Lead Counsel") advised the court it could consider the letter, and no other counsel objected.

After full consideration of all matters of record, and upon finding that notice to the Class was adequate and sufficient, and considering the entire matter of the proposed Settlement:

**IT IS ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

**I.**

## Settlement and Class Certification

The Consolidated Actions challenged the information about a proposed merger between Hatteras and Annaly Capital Management, Inc. ("Annaly"), as described in Hatteras's Schedule 14D-9 Recommendation Statement filed with the Securities Exchange Commission, as required by federal law. Plaintiff James Wilson

filed the first of these Consolidated Actions on May 11, 2016, and on May 20, 2016, moved to enjoin the proposed transaction for alleged failure to provide material disclosures.  On May 26, 2016, Plaintiff William Friedman filed an action in this court as well, and the actions were subsequently joined as the Consolidated Actions.  Two other actions against Hatteras were filed in Maryland: Bushansky v. Hatteras Financial Corp., case no. 1:16CV1621-RDB, pending in the U.S. District Court in Maryland; and Twiss v. Hatteras Financial Corp., case no. 24-C-16-2862, pending in the Circuit Court for Baltimore City.  They are not part of these Consolidated Actions.

The parties engaged in immediate negotiations and limited discovery, culminating in a negotiated revised 14D-9 schedule that was filed on July 1, 2016, some 11 days before the tender offer closed on July 11, 2016.  The transaction closed the next day, July 12.  No shareholder of Hatteras, or anyone else for that matter, opposed the transaction.

On July 3, 2017, the court preliminarily certified the Class defined as anyone who held Hatteras common stock at any time from April 10, 2016, to July 12, 2016, and approved the Notice of Pendency and Proposed Settlement of Class Action Shareholder Litigation, Settlement Hearing, and Right to Appear (the "Notice"), which has been provided pursuant to and in the manner directed by the Preliminary Approval Order.  Proof of dissemination

of the Notice was filed with the court; and full opportunity to be heard has been offered to all members of the Class.  The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances to all persons entitled to such notice of the Settlement Hearing and the proposed Settlement, and to have met the requirements of Rule 23(c)(2)(A) of the Federal Rules of Civil Procedure and of due process.  It is further determined that all members of the Class are bound by this Order and Final Judgment.

For purposes of settlement only, the court hereby certifies the Class as a non-opt-out class pursuant to Rules 23(a), 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure.  The Class consists of any and all Persons who were record holders or beneficial owners of any share(s) of the common stock of Hatteras at any time during the period beginning on and including April 10, 2016, and ending on and including July 12, 2016, including any and all of their respective successors in interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under any of them, excluding the Defendants and the members of the immediate families of the Directors.  The court finds, for purposes of settlement only, that each of the requirements of Rules 23(a), 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure have been

satisfied, in that (i) the Class is so numerous that joinder of all members is impracticable, (ii) there are questions of law and fact common to the Class, (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the Class, (iv) the Plaintiffs and their counsel are adequate representatives of the Class, (v) the prosecution of separate actions by members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class that would establish incompatible standards of conduct for Defendants and/or adjudications with respect to individual members of the Class that would as a practical matter be dispositive of the interests of members of the Class or substantially impair or impede their ability to protect their interests, and (vi) and Defendants have acted on grounds that apply generally to the Class.

On November 18, 2016, subject to further consideration at the Settlement Hearing, the court appointed the Plaintiffs in the Consolidated Actions as co-lead plaintiffs ("Lead Plaintiffs") and their counsel as Lead Counsel. The court finds that, based on the record in the Consolidated Actions, Lead Plaintiffs and Lead Counsel have fairly and adequately protected and represented the interests of the Class.

This court has jurisdiction over the subject matter of the Consolidated Actions, including all matters necessary to

effectuate the Settlement and this Order and Final Judgment, and over all parties to the Consolidated Actions.

The court hereby adopts and approves the Settlement - as to the relief obtained - as being in all respects fair, reasonable, adequate, just, in the best interest of the parties and the Settlement class, and in compliance with all applicable requirements of the United States Constitution (including the Due Process Clause), Rule 23 of the Federal Rules of Civil Procedure, and all other applicable laws.  In making this determination, the court finds that the Settlement has been reached "as a result of good-faith bargaining at arm's length, without collusion, on the basis of (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation."  In re Jiffy Lube Sec. Litig., 927 F.2d 155, 158-59 (4th Cir. 1991).  The court has found the Settlement to be adequate, having considered the following factors: (1) the relative strength of the Plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the Plaintiffs would likely encounter if the case went to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the Defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the

settlement.  Id. at 159.  In considering the fairness and adequacy of the Settlement, the court has given weight to the fact that the Settlement has not been opposed by any shareholder but was objected to by one shareholder as obtaining additional disclosures that were "trivial information."  The parties to the Stipulation are hereby authorized and directed to comply with and to consummate the Settlement in accordance with the terms and provisions of the Stipulation.

In making these conclusions, the court finds that: (1) Hatteras filed an amended 14D-9 with additional disclosures (the "Supplemental Disclosures") as a result of Plaintiffs bringing this suit; (2) these Supplemental Disclosures, and this Settlement, are the result of extended arm's-length negotiations between the parties and their counsel; (3) these Supplemental Disclosures provided Hatteras's shareholders with technically material, yet previously undisclosed, information about the background of the merger including the presence of a standstill provision with Company A, financial information that Hatteras and Goldman, Sachs & Co. (Hatteras's financial advisor in this transaction) relied on in making their projections, which was available if shareholders sought to attain additional information as to tendering their shares and to more fully judge the credibility of the projections in the 14D-9, and financial projections for companies that were deemed similar to Hatteras;

(4) Lead Counsel have engaged in discovery both before and after the Settlement; (5) Lead Counsel have extensive experience in the areas of securities litigation; (6) the probability of the Plaintiffs succeeding in litigation on any additional claims is low; and (7) the absence of any collusion or fraud in the Settlement. (Doc. 45 at 15–24.)

In approving the settlement, the court does find that the Supplemental Disclosures were legally material. See In re Pure Res., Inc. S'holders Litig., 808 A.2d 421, 449 (Del. Ch. 2002) (noting the importance of valuation analysis that supports conclusions found in disclosure documents); Brown v. Brewer, No. CV06-3731-FHK SHX, 2010 WL 2472182, at *21 (C.D. Cal. June 17, 2010) (explaining that "[a] reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued"); SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) (stating that material facts "include any fact 'which in reasonable and objective contemplation might affect the value of the corporation's stock or securities'"). However, their practical benefit to the Class was marginal.

At the November 8, 2017, hearing, Lead Counsel characterized the Supplemental Disclosures in substance as follows: providing material GAAP financial forecasts relied on by the Hatteras board and Goldman Sachs to recommend the transaction; providing an

8

illustrative pro forma accretion/dilution analysis; disclosing the companies Goldman Sachs reviewed (and their annualized dividend yield) in preparing its analysis to recommend the merger; providing price-to-book ratios that Goldman Sachs calculated in its analysis and in reaching the already-disclosed opinions in the 14D-9; providing information about the manner in which the banker determined equity value ranges, including the manner of calculating the discount rate; providing information about non-disclosure agreements and "other background to [the Hatteras] board's decisions to pursue a sales transaction"; and information as to Goldman Sachs's conflict check process (although no conflict was alleged or demonstrated).

While the Supplemental Disclosures provided background information on the conclusions in the original 14D-9, as well as information about the standstill provision with Company A, and financial information and projections that Lead Counsel stress the value of, it is not at all clear that this information provided any real benefit to any Hatteras shareholder or actually influenced any Class member's decision to tender his shares. This is especially true given that the 14D-9 was provided to shareholders only eleven days before the merger closed.

Specifically, the substance of the information added to the Supplemental Disclosures (including projected net income, projected dividends, additional information regarding analysis of

selected comparable companies, and discount dividend analysis)
served only to buttress conclusions that were already stated in
the original 14D-9.  While Lead Counsel argue that this information
is vital to shareholders, as it allows them to weigh the
credibility of the conclusions in the original 14D-9, the court is
skeptical that any shareholder benefitted materially from this
information, given that underlying conclusions were already
present.  Further, while the Supplemental Disclosures did include
the statement that the merger between Hatteras and Annaly would be
dilutive to the holders of shares of Hatteras common stock, the
information most material to a shareholder's decision whether to
tender his shares (the consideration for tendered shares, the
present value of the shares, certain financial projections, and
the fairness opinion) was present in the original 14D-9. (Doc. 46-
2 at 7, 11-25.)

Lastly, Lead Counsel urge that the disclosure of the
standstill provision in the Supplemental Disclosures was material.
(Doc. 45 at 28-29.)  This is technically true, but its practical
value to a shareholder deciding whether to tender his shares has
not been demonstrated.  A shareholder considering whether to tender
his shares based on the original 14D-9 would have been in
substantially the same position as a shareholder considering
whether to tender his shares based on the amended 14D-9.  So, while
the court approves this settlement, it cannot overlook the fact

that this case has the hallmarks of one that was sought out by counsel, subjected to technical challenges (including the filing of two other lawsuits in other jurisdictions and requests for preliminary, emergency injunctive relief) at a time when the parties to the proposed transaction were most vulnerable to delay, and resolved through agreed-upon modest technical changes that largely amplified information already present in the 14D-9.

Courts assessing a settlement class action must be wary of any collusion between class counsel and a defendant. Here, Hatteras agreed to the settlement and has not filed a brief in opposition to Plaintiffs' briefing. But this is because it was a concession agreed upon as part of the Settlement. No direct collusion is apparent, yet the nature of the marginal relief obtained, combined with Plaintiffs' inability to identify any further grounds for objection following only three depositions and some limited written discovery, only reinforces the court's heightened concern about ensuring that the amount of the attorneys' fees awarded are justified by the benefit obtained for the Class.

Therefore, except with regard to any award of attorneys' fees and expenses set forth below, the Consolidated Actions are hereby DISMISSED WITH PREJUDICE in their entirety as to Defendants and against Plaintiffs and all other Class Members and with each party bearing his, her, or its own costs.

As provided in the Stipulation and pursuant to this Order and

Final Judgment, each of the Plaintiffs, the other Class Members, and the Successors of all of the Class Members (collectively, the "Releasing Persons") shall be deemed to have irrevocably, unconditionally, completely, fully, finally, and forever compromised, released, relinquished, discharged, extinguished and dismissed with prejudice, any and all Released Claims against Defendants and other Released Persons.

As provided in the Stipulation and pursuant to this Order and Final Judgment, the Released Persons shall be deemed to have irrevocably, unconditionally, completely, fully, finally, and forever compromised, released, relinquished, discharged and extinguished, any claims, allegations, sanctions or petitions against the Plaintiffs, the other Class Members and the Plaintiffs' counsel arising as a result of the investigation, pleading, initiation, prosecution, litigation, settlement or resolution of the Actions; provided, however, that the Released Persons shall retain the right to enforce the terms of the Stipulation and the Settlement.

The Releasing Persons are hereby permanently barred and enjoined from commencing, instigating, instituting, maintaining, prosecuting, asserting, or participating in any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, or other forum of any kind, whether individual, class, derivative, representative, legal equitable, or

in any other capacity, asserting any of the Released Claims against any of the Released Persons.

## II.

## Attorneys' Fees and Expenses

Lead Counsel request a total award of $700,000 for attorneys' fees and expenses. (Doc. 44 at 2.) They have submitted affidavits of counsel in the two Consolidated Actions as well as in the two related actions in Maryland that, in the aggregate, claim fees of $536.261.75 and expenses of $22,257.28. By the terms of the Settlement, Hatteras has agreed not to oppose an award up to $700,000. (Doc. 46-1 at 15.) In other words, Lead Counsel seek the maximum amount that Hatteras has agreed to pay.

Under Federal Rule of Civil Procedure 23(h), "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fees generally are considered as a percentage of the recovery, or based on a "lodestar" method, which multiplies the number of hours worked by the hourly rate of similarly-experienced counsel in the area. See Deloach v. Philip Morris Cos., No. 1:00CV01235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003). Lead Counsel argue the latter here. In assessing an agreed-upon fee, the court is not bound by the parties' agreement. Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 849 (5th Cir. 1998). Nor does the fact that the defendant will pay the fees from its own coffers reduce the need for the

court's inquiry, because such an agreement diminishes a defendant's adversarial role. In re Heartland Payment Systems, Inc., 851 F. Supp. 2d 1040, 1069-70 (S.D. Tex. 2012) (citing cases). Rather, the court should carefully review the application for reasonableness to ensure that counsel has not exploited the class action vehicle for their benefit. Id. at 1069 (quoting In re High Sulfur Content Gasoline Prods. Liab. Litig., 517 F.3d 220, 228 (5th Cir. 2008)).

Lead Counsel's request is supported by affidavits of James M. Wilson, Jr., Esquire, and Brian D. Long, Esquire, in the Consolidated Actions. (Docs. 46-4, 46-5.) These affidavits provide the names of the lawyers and professionals who billed time to the Consolidated Actions, their billing rate, and the number of hours (broken down in nearly all instances to what appears to be the nearest quarter of the hour). No time records have been submitted, however. Mr. Wilson's affidavit does have a single paragraph describing generally the types of activities engaged in; Mr. Long's affidavit does not. (Doc. 46-4 at 3.) Therefore, the court is unable to assess the reasonableness of the time claimed to have been expended in connection with the work said to have been done. Phillips v. Triad Guar. Inc., No. 1:09CV71, 2016 WL 2636289, at *7 (M.D.N.C. May 9, 2016) (quoting Boyd v. Coventry Health Care Inc., 299 F.R.D. 451, 468 (D. Md. 2014)) (holding that where the record contained only the total number of hours spent by

each attorney or professional, with no specification of date or task, it was impossible for the court to assess unproductive time and the quoted lodestar multiplier was likely artificially low); Wininger v. SI Mgmt. L.P., 301 F.3d 1115, 1126 (9th Cir. 2002) (noting that the party petitioning for attorneys' fees bears the burden of submitting detailed time records to justify the hours claimed to have been expended); Saizan v. Delta Concrete Prods. Co., 448 F.3d 795, 799 (5th Cir. 2006) (stating that the requirement that counsel provide billing records discharges counsel's duty to demonstrate the reasonableness of the hours billed and therefore provides proof that counsel exercised billing judgment).

The total amount of attorneys' fees represented to have been incurred in connection with the Consolidated Actions by Messrs. Wilson and Long is $195,492.50 and $93,018.75, respectively. (Doc. 46-4 at 4; Doc. 46-5 at 3.) These invoices report professional hours of 299.70 and 164, respectively. (Doc. 46-4 at 4; Doc. 46-5 at 3.) The total amount of expenses is $2,441.84 and $122.50, respectively. (Doc. 46-4 at 5; Doc. 46-5 at 4.) Just as no timesheets were provided for the attorneys' fees application, however, no backup documentation for expenses has been provided.

In addition, Lead Counsel have submitted affidavits of Richard A. Acocelli, Esquire, and Donald J. Enright, Esquire, in connection with two other cases brought in Maryland courts against

Hatteras and settled as part of the Stipulation and Settlement. (Docs. 46-6, 46-7.)   Mr. Acocelli represented plaintiffs in Bushansky v. Hatteras Financial Corp., case no. 1:16CV1621-RDB, pending in the U.S. District Court in Maryland.   Mr. Enright represented plaintiffs in Twiss v. Hatteras Financial Corp., case no. 24-C-16-2862, pending in the Circuit Court for Baltimore City. Like the other affidavits, these provide the names of the lawyers and professionals who billed time in those actions, their billing rate, and the number of hours (which, for at least one firm, appear to be broken down to the nearest tenth of the hour).   Also, as with the other affidavits, no actual time records have been submitted, but each lawyer provides a paragraph summary of the general nature of the work performed.   Therefore, the court cannot assess the reasonableness of the time entries in connection with the work said to have been done in these cases, either.   The total amount of attorneys' fees represented in the affidavits of Messrs. Acocelli and Enright to have been incurred in connection with these related cases is $146,142 and $95,483.50, respectively.   (Doc. 46-6 at 4; Doc. 46-7 at 4.)   The total expenses are $16,996.76 and $1,896.18, respectively.   (Doc. 46-6 at 5; Doc. 46-7 at 4-5.)   No backup documentation, especially from any third-party vendor or expert witness, is provided for any expense.   These firms are said to have worked 213.80 and 164.75 professional hours, respectively. (Doc. 46-6 at 4; Doc. 46-7 at 4.)

Lead Counsel contend that the court can and should consider the attorneys' fees and expenses incurred by these other counsel in the Maryland related cases in assessing the reasonableness of the requested fee award in this case. (Doc. 50 at 8-14.) When the court questioned counsel about its authority to do so during the November 8 hearing, counsel accepted the court's invitation to file briefing on this point. In that briefing, counsel relies principally on Hanlon v. Chrysler Corporation, 150 F.3d 1011 (9th Cir. 1998), and Wininger v. SI Management L.P., 301 F.3d 1115 (9th Cir. 2002). (Doc. 50 at 5-8.) In the alternative, counsel argues that the court should approve the requested fee award based on a multiplier of the attorneys' fees and expenses incurred in the Consolidated Actions alone. (Id. at 14-15.)

In this circuit, a court assessing a class action settlement is obliged to assess and approve an award of attorneys' fees and expenses to counsel that is fair and reasonable. Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978). What constitutes a fair and reasonable amount is within the discretion of the court to determine. Id. In making this determination as to attorneys' fees, the Fourth Circuit considers twelve factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount

in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Barber, 577 F.2d at 226 n.28; Grissom v. The Mills Corp., 549 F.3d 313, 320-21 (4th Cir. 2008); see also Jackson v. Estelle's Place, LLC, 391 F. App'x 239, 243 (4th Cir. 2010). The court can, as this court does, use these factors in combination with the lodestar amount (the reasonable hourly rate multiplied by the number of hours reasonably expended) to determine the appropriate fee amount to award. Grissom, 549 F.3d at 320-21. The court will address each factor in turn.

**(1)  Time and labor expended**

In the Consolidated Actions, Lead Counsel represent they incurred 290 hours of partner time, 115.25 hours of associate time, and 60.55 hours of paralegal time. (Doc. 46-4 at 4; Doc. 46-5 at 3.) Because there are no timesheets submitted, the court cannot assess the substance of the work said to have been performed. The only description of work appears in the affidavit of Mr. Wilson, which provides the following summary:

> correspondence with client; review, analysis and annotation of merger agreement; drafting, editing and revising original complaint; filing of original complaint; review analysis and annotation of proxy statement; drafting and revising of amended complaint; drafting and proffering discovery demands; extensive telephonic and email meet-and-confers with defense counsel concerning discovery demands, email and

telephonic communication with defense counsel regarding
document production; drafting a confidentiality
stipulation and protective order; review and analysis of
confidential, non-public discovery; consultations with
financial expert concerning proxy statement and analysis
of non-public discovery; settlement and disclosure
demands; review and negotiation of Supplemental
Disclosures; drafting and revising of memorandum of
understanding; telephonic and email communications and
negotiations concerning additional confirmatory
discovery; reviewing and analyzing confirmatory
discovery; prepping for and conducting a deposition;
reviewing and revising Stipulation of Settlement and
exhibits thereto including Notice to class, scheduling
order and preliminary approval order; telephonic
appearance; extensive telephonic and email
communications with Defense Counsel and co-counsel
regarding litigation strategy throughout the prosecution
of the litigation.

(Doc. 46-4 at 3.)

In the Maryland actions, it is represented that 156.1 hours
of partner time, 230 hours of associate time, and 2.1 hours of
paralegal time were incurred.  (Doc. 46-6 at 4; Doc. 46-7 at 4.)
The work described is similar to the work described for the
Consolidated Actions.  (Doc. 46-6 at 3.)

As noted, the court is significantly handicapped by Lead
Counsel's failure to provide any meaningful description of the
work.  In the absence of timesheets, the task of assessing the
labor expended is effectively impossible.  Moreover, during the
hearing, Lead Counsel acknowledged that much of the discovery
practice, particularly the depositions, were conducted to ensure
no other claims were available to the Class.  In the context of
what the court has learned about the litigation, the claims, and

the relief obtained, it is far from persuaded that this "confirmatory discovery" provided any significant benefit to the Class, especially given the absence of any time sheets. (Doc. 45 at 13.)

**(2) Novelty and difficulty of the questions raised**

Securities litigation can raise difficult, if not necessarily novel, questions. In this case, counsel investigated numerous corporate filings, analyzed complex financial data, moved for preliminary injunction, took three depositions, and consulted with experts, all on an expedited basis. The issues do not appear to be novel, however.

**(3) Skill required to properly perform the legal services rendered**

Given the nature of the legal issues presented, this case required reasonably skilled counsel with experience in bringing shareholder class action suits. Such skill was a prerequisite to Lead Counsel's appointment in these cases, however.

**(4) Counsel's opportunity costs in pressing the instant litigation**

Counsel has not provided any information on this factor. Counsel's professed proficiency in similar cases suggests that these types of securities cases are counsel's bread and butter.

**(5) Customary fee for like work**

Lead Counsel have provided a National Law Journal survey, entitled, "Billing Rates at the Nation's Priciest Law Firms," of

20

general billing rates for partners and associates in the relevant legal communities of New York City and Washington, D.C., where Lead Counsel practice law. (Doc. 46-12.) The rates themselves provide only generalized information, represent those of "the priciest law firms," and thus are of marginal benefit. See Design Res., Inc. v. Leather Indus. of Am., No. 1:10CV157, 2016 WL 5477611, at *13 (M.D.N.C. Sept. 29, 2016) (explaining that the correct manner of proving reasonable hours rates is with affidavits of local lawyers who familiar with the skill of the fee applicants and with the type of work in the relevant community). However, a closer examination of the experience of the lawyers who are listed as having worked on the Consolidated Actions and related cases demonstrates that their reported hourly rates vastly exceed that of others with similar experience, thus leading the court to doubt the appropriateness of the reported rates.

For example, one associate, Ms. Goodrich graduated law school in 2011 but seeks a rate in this case of $580 an hour, and another associate, Mr. Van Gorder, graduated law school in 2015 but is listed as a partner and charged out at $450 an hour. (Doc. 46-4 at 3.) No information is provided for Mr. Monteverde, who is listed at $775 an hour, except that he left Lead Counsel's firm to start his own law firm. (Id. at 3 n.1.) Paralegals are charged out at $300 to $375 an hour. (Id. at 4.) These rates appear excessive, especially in the absence of any description of their

work or any explanation of how their skill level was required for the work they performed.

As to the work performed by Mr. Long's firm, the partner rates appear to be at the high end of the market. (Doc. 46-5 at 3.) While the lawyers appear well qualified, the materials provided are insufficient to meaningfully evaluate the experience of the associates, who appear to be relatively recent law school graduates.

As to the Maryland actions, the rates appear overly aggressive for market conditions. For example, Mr. Acocelli, a 1990 law graduate, is listed at $885 an hour. (Doc. 46-6 at 4.) Associate Kelly Keenan is listed at $465 an hour, even though she graduated law school in 2012. (Id.) And Mr. Rogovin is listed at $695 an hour, even though he graduated in 2003. (Id.) No information is provided as to Mr. Rosenstein, an associate, who is listed at $395 an hour. (Id.) Their paralegal has a rate listed at $345 an hour, nearly that of associate Rosenstein. (Id.) Mr. Enright's affidavit lists himself, a 1996 law graduate, at $875 an hour, partner Elizabeth Tripodi, an eleven-year lawyer, at $695 an hour, and associate Jordan Cafritz, who graduated law school in 2014, at $425 an hour. (Doc. 46-7 at 4.) No information is provided for associate Katherine DeStefano to enable the court to evaluate the reasonableness of the $455 an hour fee requested. (Id.)

In contrast to these applications, the application of Thomas

Minton, who represented Plaintiff Stephen Bushansky in one of the Maryland actions, shows that he is experienced in shareholder class action litigation, graduated Georgetown University Law Center in 1982, and charges $625 an hour.  (Doc. 46-9 at 3.)  He attests that his survey of attorneys in Baltimore and Washington, D.C., confirms that his rate "is commensurate with the customary rates charged by attorneys with over 30 years' experience in similar matters."  (Id.)  The court agrees.  This also demonstrates, however, that the rates for professionals noted above with far less experience are overstated.

Correcting, on the basis of experience and regional rates, for overstated rates alone (without adjusting for the inability to meaningfully examine the reasonableness of the work given the lack of detailed timesheets) leads the court to calculate the highest end for lodestar fee rates for the firms as follows:

| | |
|---|---|
| Faruqi firm: | $174,419.25[2] |
| Rigrodsky firm: | $77,570[3] |
| Weiss firm: | $121,406.5[4] |
| Levi firm: | $82,045[5] |
| Ward Black firm: | $0 |

---

[2] Reducing Monteverde to $600 an hour, Goodrich to $400, and the paralegals to $265.
[3] Reducing Rigodsky to $750 an hour, Long to $550, Riley to $350, and Allocco to $265.
[4] Reducing Acocelli to $750 an hour, Rubin and Rogovin to $500, Keenan to $400, and Silver to $265.
[5] Reducing Enright to $750 an hour, Tripodi to $500, and DeStefano and Cafritz to $400 an hour.

Goldman/Minton firm:      $6,125

Collectively, this amounts to a total lodestar attorneys' fee of
$461,565.75 compared to a requested lodestar of $536.261.75.

        Lead Counsel argue that, taking into account the work done in
both the Consolidated Actions and the Maryland actions, their
requested fee of $700,000 is only a multiple over their calculated
lodestar of 1.26.  But, using the court's reduced lodestar that
attempts to adjust for inflated rates increases the lodestar
multiplier to 1.52.  In any event, Lead Counsel argue that the
lodestar multiplier is "modest."  (Doc. 50 at 14.)  Perhaps, if
either multiplier were awarded.  See Kay Co. v. Equitable
Production Co., 749 F. Supp. 2d 455, 470 (S.D. W. Va. 2010) (noting
that, in a class action under Rule 23, "lodestar multipliers
falling between 2 and 4.5 demonstrate a reasonable attorneys'
fee").  However, the Supreme Court has stated that "although
upwards adjustments of the lodestar figure are permissible, 'such
modifications are proper only in certain "rare" and "exceptional"
cases;' there is a strong presumption that the lodestar figure
represents a 'reasonable fee.'"  Johnson v, Sullivan, No. Civ-HM-
89-2999, 1992 WL 510002, at *3 (May 4, 1992) (quoting Pennsylvania
v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546,
565 (1986)).

        The strong presumption that a lodestar represents a
reasonable fee rests, of course, on the presence of detailed

                                  24

timesheets to support the calculation.  Lead Counsel's failure to submit such records deprives them of such a presumption.  Moreover, this lodestar multiplier is certainly artificially low, due to the fact that counsel has not submitted any meaningful description of the actual work done, and when and by whom, which makes it impossible for the court to assess any duplication of effort or unproductive time.  Phillips, 2016 WL 2636289, at *7; Wininger, 301 F.3d at 1126.  The lack of detailed time records also renders the court unable to discern how much of the overall requested fee comes as a result of the "confirmatory discovery" counsel engaged in whose value is at best dubious.

**(6)  Counsel's expectations at the outset of the litigation**

Lead Counsel note that there was a "substantial risk" that Plaintiffs would not prevail. (Doc. 45 at 36.)  However, counsel's experience in bringing similar cases in a fashion to leverage a settlement suggests that counsel expected a favorable resolution of some sort early in the litigation.  In any event, Lead Counsel was perceptive, as the strength of Plaintiffs' claims was marginal.

**(7)  Time limitations imposed by the client or circumstances**

The lawsuit sought early injunctive relief to disrupt the merger between Hatteras and Annaly.  As a result, counsel had the potential of working under time limitations to resolve the claims before the merger was finalized.  However, no preliminary

injunctive hearings or proceedings ever took place, so this factor
has nominal, if any, bearing.

**(8) Amount in controversy and the results obtained**

The Supreme Court has stated that the degree of success
obtained is the most important factor in determining the
reasonableness of a fee. <u>Farrar v. Hobby</u>, 506 U.S. 103, 114
(1992). While the merger offer allowed for each participating
Hatteras shareholder to receive (1) $15.85 in cash, (2) 1.5226
shares of Annaly common stock, or (3) $5.55 in cash and .9894
shares of Annaly common stock for each share of Hatteras common
stock, the Settlement does nothing to increase that amount. (Doc.
46-2 at 11.) Instead, the Settlement provides Supplemental
Disclosures adding background information on the merger and
information that Hatteras shareholders could use to assess the
credibility of financial projections in the originally filed 14D-
9. Lead Counsel argue that this prevented the Hatteras
shareholders from suffering the irreparable harm of making an
uninformed decision to tender their shares. While Hatteras
acknowledges that the lawsuit pursued alleged technical disclosure
violations, it denies any wrongdoing. (Doc. 46-1 at 7.) The court
remains convinced that the benefit of these disclosures to the
Class was marginal at best and thus has serious doubts as the
ultimate value to the shareholders of the results obtained. (<u>See</u>
Doc. 45 at 37.)

**(9)  Experience, reputation, and ability of counsel**

Lead Counsel has provided documentation as to its collective experience in shareholder litigation and settlement.  (Doc. 46-4 through 46-9.)  Having carefully reviewed it, the court finds that counsel enjoys a reputation for experience in cases such as these.  However, this was a prerequisite for counsel's appointment to represent the Class.  Fed. R. Civ. P. 23(g)(1)(A).

**(10)  Undesirability of the case within the legal community in which the suit arose**

Counsel accepted this case on a contingency fee basis.  Any undesirability of the cases relates to the negligible nature of the relief sought and obtained.  Thus, the court tempers consideration of the contingent nature of the work with the weak nature of the claims raised and the perceived value of this case on this record.  Cf. McKittrick v. Gardner, 378 F.2d 872, 875 (4th Cir. 1967).

**(11)  Nature and length of the professional relationship between counsel and client;**

Lead Counsel has not provided any information on this factor and the court sees no reason to find that there is any long-term relationship between counsel and client here.  This determination is consistent with the overall appearance of the cases as having been originated by the lawyers.

**(12)  Attorneys' fees awards in similar cases.**

Lead Counsel correctly asserts that the requested fee in this

case – at least at first blush – falls generally within the range of fees that have been awarded in disclosure-based settlements. (Doc. 45 at 34.) For example, In re Progress Energy Shareholder Litigation, No. 11 CVS 739, 2011 WL 5967183, at *12 (N.C. Super. Nov. 29, 2011), the court granted an award of $550,000 in attorneys' fees for a disclosure-based settlement. However, in that case the award was based on over 3,000 hours of work and the rate was approximately $130 per hour. Id. at *9. In contrast, similar disclosure settlements have been rejected, thus leading to no award of attorneys' fees. See, e.g., In re Trulia, Inc. Stockholder Litig., 129 A.3d 884, 887, 891-99 (Del. Ch. 2016); In re Walgreen Co. Stockholder Litig., 832 F.3d 718, 725-26 (7th Cir. 2016).[6]

    Considering all of these factors, the court concludes that

---

[6] Lead Counsel also cite to several out-of-circuit orders in shareholder class action litigation, some with disclosures similar to those at issue here that settled after supplemental disclosures were filed. (Doc. 46-10; Doc. 46-13; Doc. 51-1; Doc. 51-4; Doc. 51-6.) These settlements resulted in attorneys' fee awards between $500,000 and $4,000,000. (Doc. 46-10 at 45-46; Doc. 51-1 at 8.) However, at a fairness hearing for one of those cases, the court expressed reluctance to approve the requested fee of $500,000 because it appeared as though counsel "didn't do very much." (Doc. 46-10 at 22.) Further, the court has been provided with no information concerning the rates charged or the number of hours billed in any of these cases, making useful comparison difficult. Similarly, at the November 8, 2017, Settlement Hearing, Lead Counsel provided the court with a slide presentation that included a list of cases where the court awarded attorneys' fees of between $595,000 and $1,000,000. But no analysis of billing information was provided to justify the approval of fees, nor did any of the orders include an analysis of why the fees awarded were proper. Instead, they contained conclusory findings that "the requested fees are fair and reasonable." Thus, these cases provide little practical guidance to support Lead Counsel's request.

$700,000 would be an unreasonable fee award in this case. Accepting that Lead Counsel identified disclosures that were technically material, but discounting for the actual value of the litigation and results obtained, the court concludes that even the adjusted lodestar amount overstates the value of counsel's work. Considering all the relevant factors herein, the court concludes that a multiplier of .76 applied to the adjusted lodestar amount is warranted and thus finds that an attorneys' fee award of $350,790.00 is fair and reasonable. Given the total lack of supporting material submitted by Lead Counsel, this award may in fact be generous. See Good Morning to You Prods. Corp. v. Warner/Chappell Music, Inc., No. CV134460GHKMRWX, 2016 WL 6156076, at *9–14 (C.D. Cal. Aug. 16, 2016) (reducing a fee lodestar amount by 25% because of, among other factors, block billing and vague descriptions in billing records by counsel); Ogrizovich v. Cuna Mutual Group, No. 2:09CV371, 2016 WL 6902420, at *3 (W.D. Pa. Apr. 4, 2016) (applying multiplier of .80 based on plaintiffs' "limited success"); In re Heartland, 851 F. Supp. 2d at 1086 (rejecting agreed-upon fee award of $725,000, and approving $606,192.50, after applying a negative lodestar cross-check adjustment of 16.3%).

Lead Counsel will therefore be awarded attorneys' fees for all four cases in the aggregate amount of $350,790.00.

As to expenses, the total lack of backup documentation significantly hampers the court's ability to make a determination of reasonableness. However, the court accepts Lead Counsel's representations as officers of the court that such expenses were incurred and paid by them. Moreover, Hatteras has presumably reviewed the expenses and has not raised any concern over them. The court notes that Mr. Wilson's affidavit seeks to recover for telephone charges. In the absence of an explanation why that is not overhead, it will be denied. Otherwise, in the absence of any objection by Hatteras, the expenses appear reasonable, and the court awards Lead Counsel $21,892.28 in expenses.

The effectiveness of this Order and Final Judgment and the obligations of Plaintiffs and Defendants under the Stipulation shall not be conditioned upon or subject to the resolution of any appeal from this Order and Final Judgment that relates solely to the issue of the award of attorneys' fees and expenses to Lead Counsel.

The fact of, and the provisions contained in, the Memorandum of Understanding that counsel executed as of June 30, 2016 (the "MOU"), the Stipulation, the Settlement and this Order and Final Judgment, and all negotiations, discussions, actions, and proceedings in connection therewith, shall not be deemed or constitute a presumption, concession, or an admission by any person and shall not be offered or received in evidence or otherwise used

by any person in the Actions, or any other action or proceeding, except in connection with any proceeding to enforce the Stipulation and the Settlement. The fact of, and the provisions contained in, the MOU, the Stipulation, the Settlement and this Order and Final Judgment, and all negotiations, discussions, actions, and proceedings in connection therewith, are intended for settlement purposes only.

Nothing in this Order and Final Judgment shall preclude any action to enforce the terms of the Stipulation, the Settlement, or this Order and Final Judgment. Notwithstanding any provision herein, any of the Released Persons or Plaintiffs may file, cite, and/or refer to the Stipulation, the facts and terms of the Settlement, and this Order and Final Judgment in any other action, proceeding or forum in order to effectuate the release and other liability protections provided thereby, or to support a defense or counterclaim that the Settlement has res judicata, collateral estoppel, or other issue or claim preclusion effect.

Without affecting the finality of this Order and Final Judgment, the court retains jurisdiction for the purpose of protecting and implementing the terms and provisions of the Stipulation, the Settlement, and this Order and Final Judgment, including the resolution of any disputes that may arise with respect to the effectuation of any of the terms and provisions of the Stipulation, and for the entry of such further orders as may

be necessary or appropriate in administering and implementing the terms and provisions of the Stipulation, the Settlement and this Order and Final Judgment.

/s/    Thomas D. Schroeder
United States District Judge

December 19, 2017